IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMERICAN MOTORISTS INSURANCE COMPANY, an Illinois corporation, as successor-in-interest to Specialty National Insurance Company, an Illinois corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>AMERICAN RE-INSURANCE COMPANY, a Delaware corporation,<br><br>    Defendant.<br>_____/ | No. C 05-5202 CW<br><br>ORDER GRANTING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT |

    Defendant American Re-Insurance Company (American Re) moves for partial summary judgment on two issues: (1) that the retrocession agreement[1] entered into by American Re and Plaintiff American Motorists Insurance Company (AMICO) is not subject to a "follow the fortunes" clause; and (2) that AMICO's bad faith claim fails as a matter of law.  Plaintiff opposes the motion and cross-moves for summary judgment on all claims.[2]  Defendant opposes

---

    [1]Retrocession coverage is the reinsurance of a reinsurance policy.

    [2]AMICO's motion is captioned as a cross-motion for partial summary judgment, but states that it seeks summary judgment "on all counts of the Second Amended Complaint."  Plaintiff's Opposition and Cross-Motion at 1.

Plaintiff's cross-motion.[3]  The matter was heard on April 20, 2007. Having considered all of the papers filed by the parties, the evidence cited therein and oral argument on the motions, the Court grants in part Defendant's motion for partial summary judgment and denies Plaintiff's cross-motion for summary judgment.

## BACKGROUND

This dispute arises out of a certificate of facultative reinsurance[4] (the American Re agreement) issued by Defendant American Re to Specialty National Insurance (SNIC), the predecessor in interest to Plaintiff AMICO.  The American Re agreement was issued to provide 100% reinsurance for a certificate of insurance issued by SNIC (the SNIC certificate) to the Montana Municipal Insurance Authority (MMIA), a municipal insurance pool that provides insurance to its member entities, including the city of Great Falls, Montana.[5]

---

[3] Defendant argues that Plaintiff's cross-motion should be limited to the claims Defendant raised in its original motion for summary judgment, citing In re Rothery, 143 F.3d 546, 549 (9th Cir. 1998).  In the alternative, Defendant seeks leave to file additional briefing and evidence in opposition to Plaintiff's cross-motion.  However, Rothery requires only that the opposing party have a "full and fair opportunity to ventilate the issues in the motion," which Defendant has had.  Id.  If Defendant required additional time or pages in which to respond to Plaintiff's cross-motion it should have moved for such prior to the date its reply/opposition brief was due.

[4] "There are two basic types of reinsurance policies--facultative and treaty. . . . In facultative reinsurance, a ceding insurer purchases reinsurance for a part, or all, of a single insurance policy.  Treaty reinsurance covers specified classes of a ceding insurer's policies."  Unigard Sec. Ins. Co., Inc. v. North River Ins. Co., 4 F.3d 1049, 1053-54 (2d Cir. 1993).

[5] MMIA obtained its policy with SNIC through the National Public Entities Excess Program (NPX), a liability reinsurance risk purchasing group.  The parties note that another policy, the

The underlying MMIA policy provides cities with coverage for their statutory liability of $750,000 for each claim and $1.5 million for each occurrence for tort actions against then, and up to $10 million for claims that do not fall within the Montana state tort cap, but otherwise fall within the scope of coverage under the policy.  Montana Code § 2-9-108 provides, "The state, a county, municipality, taxing district, or any other political subdivision of the state is not liable in tort action for damages suffered as a result of an act or omission of an officer, agent, or employee of that entity in excess of $750,000 for each claim and $1.5 million for each occurrence."  Mont. Code Ann. § 2-9-103(1).  Further, the code states, "An insurer is not liable for excess damages unless the insurer specifically agrees by written endorsement to provide coverage to the governmental agency involved in amounts in excess of a limitation stated in this section, in which case the insurer may not claim the benefits of the limitation specifically waived."  Id. at § 2-9-108(3).

Defendant states that the SNIC policy provides reinsurance for MMIA's $10 million "non-tort cap related" exposure in excess of MMIA's $750,000 per person and $1.5 million per occurrence retention for claims falling within Montana's statutory cap.  As discussed below, Defendant's position is that the SNIC policy was a reinsurance policy that did not provide any excess liability coverage; thus, the policy was not sufficient to waive the

---

American Protective Insurance Company (AMPICO) policy, might also have been in effect, providing coverage to MMIA through NPX at the time of the underlying claim.

3

statutory tort cap pursuant to Montana Code § 2-9-108. Plaintiff concedes that the insurance policy it issued to MMIA was on a reinsurance form but claims that it was an excess policy.

On March 10, 2001, when all of the agreements mentioned above were in effect, Jeremy Parsons suffered a severe brain injury at the Cascade County Fairgrounds in Great Falls, Montana, when a steel beam fell off of a concrete pillar, crushing his head and face. Parsons filed a claim with MMIA in April, 2001, alleging that the beam was maintained by the City of Great Falls. On August 13, 2001, MMIA provided its "first report of potential excess claim" to its reinsurer, SNIC.

On July 23, 2002, Parsons filed a complaint for declaratory relief in Montana state court, seeking damages in excess of the Montana statutory cap and challenging the constitutionality of the cap. On August 13, 2002, Parsons' attorney informed SNIC that because it had repeatedly failed to respond to Parsons' requests seeking confirmation that SNIC provided excess liability coverage to the City of Great Falls, he would amend the complaint joining SNIC as a defendant. The amended complaint also sought a declaration of the nature and extent of coverage under the SNIC policy. At that point, MMIA had paid Parsons $750,000, exhausting its $750,000 policy limit.

After receiving the amended complaint, SNIC sought a coverage opinion from Curtis Drake, the attorney representing the City of Great Falls, asking whether the statutory cap on damages applied to the SNIC certificate. On September 10, 2001, Drake stated that the cap likely would not apply to SNIC because its policy "specifically

4

1  provides coverage for damages in excess of" the statutory
2  limitations.  Craig Declaration, Exhibit M.  However, Drake noted
3  that he had not received or reviewed any of the correspondence
4  between the parties or the SNIC certificate before offering his
5  opinion.  On October 21, 2001, Drake filed an answer on behalf of
6  SNIC, admitting that the SNIC policy provided coverage of up to $10
7  million in excess of the coverage provided by MMIA.

8      In June, 2002, SNIC prepared a Major Loss Report (MLR) for the
9  Parsons claim.  In December, 2002, SNIC prepared a second MLR.
10 Defendant alleges that it first learned of the claim when it
11 received the December, 2002 MLR on March 31, 2003.  However,
12 Plaintiff provides evidence that it faxed the Parsons complaint to
13 Defendant's claims representative as early as February 6, 2002.
14 Further, one of Defendant's own exhibits clearly states, "American
15 Reinsurance has been aware of this claim since approximately August
16 2001" and "Drake forwarded the Answer for review before it was
17 filed.  Therefore, American Reinsurance had an opportunity to
18 consider this issue when the Answer was filed in October 2002."
19 Craig Declaration, Exhibit S at 1.

20     On May 15, 2003, Defendant notified Plaintiff that it believed
21 that Drake had a conflict of interest in representing both the City
22 of Great Falls and SNIC, and that SNIC should retain coverage
23 counsel.  Therefore, SNIC retained Susan Roy to answer the Second
24 Amended Complaint filed May 1, 2003.  Roy was instructed by SNIC
25 and American Re that the SNIC certificate "is a reinsurance policy
26 to MMIA and not an excess policy for claims against members in the
27 MMIA pool."  Id.  However, Roy expressed concerns about SNIC

28                                    5

changing its position with respect to its policy.  She stated,

> It's our opinion that no amount of tweaking or word smithing will mitigate the inconsistency which will be apparent.  [SNIC] made a judicial admission that it is excess insurance and is now changing that admission. . . Since excess insurance and reinsurance are completely different, Specialty National cannot argue in good faith that its reference to excess insurance actually meant reinsurance.

Id. at 2-3.  Further, Roy stated, "It is not as if we are considering the policy without a context . . . At no time has anyone asserted that this policy is reinsurance to reimburse MMIA for any amounts it might pay above the self-insured retention, which it would not because its limits match the self-insured retention.  Rather, the file is replete with references to excess insurance."  Id. at 3-4.  Therefore, Roy recommended that SNIC not change its position and stated that it likely would face bad faith exposure if it did so.  This same letter indicated that American Re had been aware of the claim since at least August, 2001 and that it had an opportunity to respond to the answer to the original complaint drafted by Drake.

On August 26, 2003, Defendant notified Plaintiff that it reserved its rights to disclaim any liability that Plaintiff incurred due to its decision to "handle the claim as if it provided direct excess liability coverage."  Craig Declaration, Exhibit T. Defendant also asserted that it "received first notice of this matter on March 30, 2003."  Id.  Defendant asserts that Plaintiff decided to stop communicating with it regarding the litigation. Plaintiff asserts that it explained to Defendant that this decision was based on concerns that communications between the two would not

6

be protected by the attorney-client privilege. In December, 2003, on the advice of several attorneys who predicted a significantly worse result at trial, Plaintiff settled with Parsons for $4.5 million. Defendant denied Plaintiff's claim for indemnification.

Plaintiff initially filed this case on December 15, 2005, after attempts to resolve the dispute without litigation. On December 22, 2005, Plaintiff filed an amended complaint as a matter of right and on February 2, 2006, the Court granted Plaintiff's motion for leave to file an amended complaint after Plaintiff obtained new counsel. Plaintiff alleges that "American Re is obligated to indemnify Plaintiff for the Parsons Loss under the AmRe Agreement, 'follow the fortunes' doctrine, and duty of good faith and fair dealing." SAC ¶ 35. Therefore, Plaintiff seeks relief on three causes of action: (1) declaratory relief regarding the respective rights and obligations of the parties under the American Re agreement; (2) breach of contract; and (3) breach of the covenant of good faith and fair dealing.

## LEGAL STANDARD

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute. Therefore, the court must regard as true

the opposing party's evidence, if supported by affidavits or other evidentiary material. <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289. The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case. The substantive law will identify which facts are material. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods. <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim. <u>Id.</u>; <u>see also</u>

Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991). If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists." Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation. Nissan, 210 F.3d at 1105. If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists. Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition. Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial. Id. at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue. UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991). Once it has done so, the non-moving party must set

9

forth specific facts controverting the moving party's prima facie case. UA Local 343, 48 F.3d at 1471. The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible." Id. This standard does not change merely because resolution of the relevant issue is "highly fact specific." Id.

## DISCUSSION

I.  Follow the Fortunes Doctrine

"Under the 'follow the fortunes' doctrine, a reinsurer is required to indemnify for payments reasonably within the terms of the original policy, even if technically not covered by it. A reinsurer cannot second guess the good faith liability determinations made by its reinsured, or the reinsured's good faith decision to waive defenses to which it may be entitled." Christiania Gen. Ins. Corp. v. Great Am. Ins. Co., 979 F.2d 268, 280 (2d Cir. 1992), as quoted by National Am. Ins. Co. v. Certain Underwriters at Lloyd's London, 93 F.3d 529, 535 (9th Cir. 1996). Included in the "follow the fortunes doctrine" is the "follow the settlements doctrine," which "prevents facultative reinsurers from second guessing good-faith settlements and obtaining de novo review of judgments of the reinsured's liability to its insured." National Am. Ins., 93 F.3d at 535. Explicit "follow the settlements" language is included in many reinsurance contracts, but Defendant asserts that no such language is included in the agreement between SNIC and American Re.

Plaintiff counters that, while the term "follow the settlements" is not included in the American Re agreement, other language in the policy is sufficient to constitute an agreement to

10

follow the settlements. Therefore, Plaintiff argues, the contract should be read to include such an obligation under California law, citing Pacific Mutual Life Insurance Company of California v. Pacific Surety Company, 69 Cal. App. 730 (1924). Plaintiff contends that Pacific Mutual provides that where a reinsurer agrees to "(1) follow the same terms of the [reinsured's] contract; (2) give the reinsured the right to settle the claim; and (3) then agree to pay the settlement made by the reinsured," a "follow the settlements" agreement should be found. Plaintiff's Opposition and Cross-Motion at 16-17. Plaintiff further argues that Defendant agreed to each of these three things, citing various provisions of the agreement between Defendant and SNIC.

Plaintiff mischaracterizes Pacific Mutual. The contract in that case read, "The 'Pacific Mutual' alone shall settle all claims and such settlements shall be binding on the 'Reinsurance Company' in proportion to its participation, whether the settlement be in full or in compromise." 69 Cal. App. at 733. This language is itself an express "follow the settlements" provision. The Pacific Mutual court had only to decide that this language, though different from language found to be a "follow the settlements" provision in another case, was in fact such a provision. No such language appears in the American Re agreement.

Similarly, the court in Royal Insurance Co. v. Caledonian Insurance Co, 182 Cal. 219 (1920), relied on specific policy language when it required the reinsurer to "follow the settlements" of the insured. There, the policy stated that it was "subject to the same risks, valuations, conditions, and adjustments as are or

11

may be taken by the reinsured, and loss if any thereunder is payable pro rata with the reinsured at the same time and place." Id. at 221. In particular, the court noted that the policy included the word "adjustments," which made "clear that the adjustment and settlement of losses, when made by the original insurer after proper investigation conducted upon good faith, should be binding upon the reinsurer." Id. at 225. Again, no such language appears in the American Re agreement. Therefore, Plaintiff has not demonstrated that a "follow the settlements" provision can be read into the contract as a matter of law.

Defendant also moves for summary judgment on this issue, arguing that a "follow the settlements" provision would be contrary to the written policy which provides that Defendant will indemnify Plaintiff "against losses or damages which [Plaintiff] is legally obligated to pay with respect to which Insurance is afforded during the terms of this Certificate under the policy reinsured," that it "will not indemnify [Plaintiff] for liability beyond circumscribed policy provisions," and that Plaintiff's settlement of claims must be "in accordance with the terms and conditions" of the certificate. Craig Declaration, Ex. D.

Based on these provisions, the Court grants Defendant's motion for summary judgment on Plaintiff's claim for declaratory relief. Although Plaintiff contended in discovery that it based its position on "custom and practice" in the reinsurance industry, it has not presented any argument or evidence to support its "custom and practice" theory either in its own motion or in support of its opposition to Defendant's motion.

12

Because Plaintiff has not established that the SNIC certificate contains a "follow the settlements" provision as a matter of law, the Court also denies Plaintiff's motion to the extent it seeks summary judgment on the claims for declaratory judgment and breach of contract. Plaintiff's arguments on those claims are based entirely on its claim that American Re is obliged to follow the settlements of SNIC.

II. Breach of the Covenant of Good Faith and Fair Dealing

A covenant of good faith and fair dealing is implied in every insurance contract. Egan v. Mutual of Omaha Insurance Co., 24 Cal. 3d 809, 818 (1979), cert. denied, 445 U.S. 912 (1980); see also, Gourley v. State Farm Mutual Auto. Insurance Co., 53 Cal. 3d 121, 127 (1991). "An insurer, like any other party to a contract, owes a general duty of good faith and fair dealing. . . . There are at least two separate requirements to establish breach of the implied covenant: (1) benefits due under the policy must have been withheld; and (2) the reason for withholding benefits must have been unreasonable or without proper cause." Love v. Fire Ins. Exch., 221 Cal. App. 3d 1136, 1147, 1152 (1990).

Defendant moves for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, arguing that Plaintiff cannot establish that it unreasonably withheld policy benefits. Plaintiff opposes Defendant's motion and cross-moves for summary judgment on the claim. Plaintiff's cross-motion necessarily fails because it has not been determined that Defendant withheld benefits due under the policy.

Defendant argues that this claim must fail because, even if it

13

was obliged to pay the underlying settlement, there was a genuine dispute regarding that obligation. "Because the key to a bad faith claim is whether denial of a claim was reasonable, a bad faith claim should be dismissed on summary judgment if the defendant demonstrates that there was a genuine dispute as to coverage." <u>Feldman v. Allstate Ins. Co.</u>, 322 F.3d 660, 669 (9th Cir. 2003) (internal quotations omitted). However, Plaintiff has produced evidence that Defendant might have acknowledged liability for such claims under an earlier, substantially similar policy. The Court finds that this is sufficient to create a triable question of fact that Defendant acted in bad faith if there is a finding that Defendant withheld benefits due. Therefore the Court denies Defendant's motion for summary judgment on this claim. Because Plaintiff has not established that benefits were improperly withheld, the Court also denies its motion for summary judgment on this claim.

## CONCLUSION

For the foregoing reasons, the Court GRANTS in part Defendant's motion for partial summary judgment (Docket No. 75) and DENIES Plaintiff's motion for summary judgment (Docket No. 83).[6]

IT IS SO ORDERED.

Dated: 5/29/07

_____
CLAUDIA WILKEN
United States District Judge

---

[6] Defendant's objection to evidence submitted by Plaintiff (Docket No. 96) is DENIED as moot. The Court did not consider any improper or inadmissible evidence in deciding these motions.

14